WESTERN ASSURANCE COMPANY OF TORONTO V. KILPATRICK-KOCH DRY GOODS COMPANY.

BRITISH-AMERICAN ASSURANCE COMPANY V. KILPATRICK-KOCH DRY GOODS COMPANY.

FILED MARCH 17, 1898.    No. 7896.

1. **Pleading**: AMENDMENT: DISCRETION OF COURT. It is not an abuse of discretion for the district court to refuse to permit an amended answer, presenting a new defense, to be filed at the time a case is called for trial, where it appears that the facts embraced in the proposed amendment were known when the original answer was filed, and no excuse is offered for the delay in making the application for leave to amend.

2. **Chattel Mortgage**: NON-DELIVERY: LIEN: EVIDENCE. A chattel mortgage which remains in the possession, or under the control, of the mortgagor may, without actual delivery, create a valid lien on the property therein described if the parties to the instrument intend that it shall have that effect. But such intention will not be presumed, and where the evidence bearing upon the question is substantially conflicting, or equivocal, the finding of the trial court that no lien was created will not be disturbed.

ERROR from the district court of Douglas county. Tried below before AMBROSE, J.    *Affirmed.*

*Frank H. Gaines, McVey & Cheshire,* and *McVey & McVey,* for plaintiffs in error.

*W. W. Morsman, contra.*

SULLIVAN, J.

These cases, presenting for determination precisely the same questions, were tried together and submitted on the same evidence. The plaintiff, Kilpatrick-Koch Dry

20

Goods Company, had findings and judgments in its favor
and the defendants, the insurance companies, have
brought the cases into this court by proceedings in error.
The actions are on policies of insurance issued to A. A.
Seagraves, a merchant doing business at Silver City,
Iowa. The insured property, a stock of merchandise,
was partially destroyed by fire, and thereafter the causes
of action arising under the contracts of insurance were
assigned to the plaintiff, a resident of this state.

The first question presented for consideration is one
of practice. The original answers were filed June 16,
1894, and on November 23, 1894, amendments which had
been filed without leave on November 7, 1894, were
stricken from the files. Defendants then asked to refile
them. The applications were denied and the defendants
excepted. The proffered amendments presented an en-
tirely new defense, the existence of which was neces-
sarily known to the defendants when the original an-
swers were filed. The applications to amend were made
on the day the cases were tried and apparently at the
time they were called for trial. No excuse was offered
for failing to include in the original answers the defense
embraced in the proposed amendments. No reason was
given for postponing the applications until the cases
were ready for trial on the merits. Under these circum-
stances was the action of the trial court an abuse of dis-
cretion? We think not. Defendants acquired no rights
by filing the amendments without leave of court. The
law did not charge the plaintiff with notice of their exist-
ence and it does not appear that it had any actual notice
of them before the day of the trial. The defendants
were, therefore, in no better attitude than if the amend-
ments had not previously been among the files of the
court. The rule in relation to amendments is stated in
1 Ency. Pl. & Pr. 637, as follows: "It is in all cases
proper to require from the party asking leave to amend
some reasonable excuse for the defect in the pleading
which it is sought to correct. The grounds for the mo-

tion must ordinarily be shown by affidavit." This rule has been recognized and approved in at least three decisions of this court. (*Commercial Nat. Bank of Omaha v. Gibson*, 37 Neb. 750; *Omaha & R. V. R. Co. v. Moschel*, 38 Neb. 281; *Johnson v. Swayze*, 35 Neb. 117.) Having reached the conclusion that the district court did not err in denying the application to amend, we need not determine whether the defense pleaded in the proposed amendments was valid or not.

It is next contended that the findings and judgments are not sustained by the evidence. This contention is based on the proposition that A. A. Seagraves executed a mortgage on the insured property in violation of a condition contained in each of the policies. It appears from the evidence that on December 27, 1893, young Seagraves made out a mortgage on the property in question to his father, J. D. Seagraves, of Dow City, Iowa, to secure a promissory note for $1,300. The note was sent to, and accepted by, the elder Seagraves, but the son retained the mortgage in his possession and under his control until after the fire, when he caused it to be recorded. The facts in relation to the making of the mortgage are not disputed and are fairly set forth in the following testimony of J. D. Seagraves:

Q. You loaned your son some money prior to this mortgage?

A. I had, $300, about one year before.

Q. And then just before that you had loaned him some more?

A. Just before that my son-in-law intended to go into business with my son, and put in his money there, and he wanted I should pay him, and I went on and let my son-in-law have the money and took my son as pay.

Q. Did you assume anything for his father-in-law?

A. He spoke that there were $300 that he had owed his father while he was in business there about a year.

Q. His father-in-law you mean?

A. His father-in-law.

Q. He came up to Dow City to see you about it?

A. He came up to tell me that he was not meeting with success, owing to the season, the last year being a very warm fall and winter, and he wanted to make me safe on loaning the money that I had paid my son-in-law, and proposed this way of fixing it up for my interest.

Q. What way do you mean?

A. He give me a mortgage.

Q. On the stock?

A. Yes, sir; on the stock.

Q. And in view of that you agreed to assume these other claims, did you?

A. I did, sir; this $300 the other money I had paid to my son-in-law for my son.

Q. Did you have any correspondence with your son after he went home and prior to the fire?

A. When he was there prior to the fire and telling me how he was situated in regard to his money matters, I stated to him how I thought it might be safe. We talked it over about the stock of goods he would give as security; make some arrangements. At that time I did not know, nor he did not know, what we ought to do. I had no experience in making loans at all of that kind, and it ran along a number of days after he was there, and he wrote me that he thought he had got it safe, and sent me the note.

Q. And told you that he had made a mortgage to secure you, did he?

A. Yes, he told me he had made arrangements, and I do not know that at the time he sent the notes, but afterwards I received the notes. It was all within a week or two before the fire—the whole transaction.

Q. And he explained to you how he had finally arranged it?

A. Yes, sir.

Q. And you talked the matter over with him, about the security, when he was down there?

A. I did when he was at Dow City.

Q. And that he was to give you a mortgage on the stock?

A. When he was at Dow City.  That was the arrangement.

Q. When he was at Dow City?

A. Yes, sir; I say it was.

Q. Where is that letter that he wrote you after he went home?  Have you got it?

A. I have not.

Q. Do you know where it is?

A. I do not.  I presume it was destroyed.  I did not consider it of any value whatever.

Q. Did he say anything about recording this mortgage in that letter?

A. Not at the time, not at the first that I heard he had made the arrangement.

Q. About the recording?

A. No.

Q. You did not know but what it had been recorded?

A. The understanding was, I did not suppose I would ever call upon my son for the money; he proposed himself he wanted to make me safe.  I wanted to help him in the business.  I was rather opposed to his going into business at first, but afterwards he seemed to have success and I concluded I would help him.

Q. He explained to you at the time it was rather a bad season, and he was more or less indebted, did he?

A. He did.

Redirect:

Q. The proposition to make the mortgage to secure you came from your son, did it?

A. It did, sir.

Q. And there was no understanding whatever about recording it?

A. The understanding was that I did not wish to have it appear that I had any interest in it, as I did not have. I wanted he should prosper in his business and he pro-

posed to make me safe by making this mortgage. At the same time I did not ask it of him.

Recross:

Q. And you agreed to assume this additional $300 at that time?

A. I did, sir.

Q. Then you talked the whole matter over how you could be safe, is that right?

A. I think it must have been, because I was very easily satisfied.

Counsel for the defendants earnestly insist that this evidence establishes the existence of a mortgage lien upon the property in favor of J. D. Seagraves. That a parol agreement to give a lien on chattels constitutes a valid mortgage is not questioned. It was so decided by this court in *Conchman v. Wright*, 8 Neb. 1, and in *Sparks v. Wilson*, 22 Neb. 112. But in the case at bar it is manifest there was no intention to create a lien in this way. The security contemplated was a formal mortgage, but whether it should be executed or not does not seem to have been definitely settled while young Seagraves was at Dow City. The entire matter was apparently committed to his charge, it being understood that whatever he should do would be satisfactory to his father. Now, it is doubtless true that a mortgage in the possession and under the control of the mortgagor may create a lien on property if the parties intend that it shall have that effect. But we are persuaded that it was not the purpose of the Seagraves to create a lien on the stock of merchandise in question in favor of the father unless it should become necessary to do so in order to prevent other creditors from resorting to it for the satisfaction of their claims. It was not the intention of the parties that a mortgage should be executed which the father could enforce against the son, but one which would be effective against other creditors in case they should attempt to seize the property. To be effective against such credi-

tors the mortgage would have to be filed for record. Whether it should be so filed was to be decided by the son, and was to depend on the condition of his business and the disposition of his creditors. Considering the purpose to be accomplished by the execution of the mortgage, and taking into account the fact the elder Seagraves did not demand the security nor ever expect to call on his son to pay the debt secured, it is entirely reasonable to infer that the parties intended that the recording of the mortgage should constitute a delivery of it, and that it should be without legal vitality until the happening of that event. The findings of the district court are sustained by the evidence and its judgments rendered thereon are

AFFIRMED.